Patrick R. Leverty
**LEVERTY & ASSOCIATES LAW CHTD.**
Reno Gould House
832 Willow Street
Reno, NV 89502
Telephone: (775) 322-6636
Facsimile: (775) 322-3953
Email: pat@levertylaw.com

[Additional counsel on signature block]

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

GARY KONIGSBERG, derivatively on behalf of MARATHON DIGITAL HOLDINGS, INC.,

    Plaintiff,

    vs.

FREDERICK G. THIEL, MERRICK OKAMOTO, SIMEON SALZMAN, HUGH J. GALLAGHER, GEORGES ANTOUN, KEVIN A. DENUCCIO, SARITA JAMES, JAY LEUPP, SAID OUISSAL, and DOUG MELLINGER,

    Defendants,

    and

MARATHON DIGITAL HOLDINGS, INC.,

    Nominal Defendant.

Case No.:    2:23-cv-01075

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Gary Konigsberg ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Marathon Digital Holdings, Inc. ("Marathon" or the "Company"), files this Verified Shareholder Derivative Complaint against individual defendants Frederick G. Thiel, Merrick

Okamoto, Simeon Salzman, Hugh J. Gallagher, Georges Antoun, Kevin A. DeNuccio, Sarita James, Jay Leupp, Said Ouissal, and Doug Mellinger (collectively, the "Individual Defendants" and together with Marathon, the "Defendants") for breaches of their fiduciary duties as directors and officers of Marathon, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, an evaluation of: (i) Defendants' public documents; (ii) Defendants' conference calls and press releases; (iii) Marathon's filings made with the United States Securities and Exchange Commission ("SEC"); (iv) legal filings; (v) news publications; (vi) analyst reports pertaining to Marathon; and (vii) information gathered on the internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.       This is a shareholder derivative action brought on behalf of Marathon against the Individual Defendants for wrongdoing committed between May 10, 2021, through and including February 23, 2023 (the "Relevant Period").

2.       Marathon is incorporated in Nevada and maintains principal executive officers in Fort Lauderdale, Florida, and Irvine, California. Marathon is a bitcoin digital mining company.

3.       In 2010, the Company started under the name "Verve Ventures, Inc." On December 7, 2011, the Company entered into the uranium and vanadium exploration business while also changing its name to the "American Strategic Minerals Corporation." In June 2012, the Company  dropped the minerals business model and shifted its focus to real estate investments in Southern California. By October 2012, the Company again changed course with a focus on intellectual property ("IP") licensing by changing its name to "Marathon Patent Group, Inc."

4.    In 2017, the Company purchased digital asset mining machines and established a data center in Canada to mine digital assets. Just three years later, the Company closed its data center in Canada, relocated all of its mining rigs to the United States, and started mining bitcoin. On March 1, 2021, the Company again changed its name, this time to Marathon. Marathon focused its business on bitcoin mining and any ancillary opportunities present in the bitcoin industry.

5.    During the Relevant Period, Marathon was primarily focused on mining digital assets with a special emphasis on the blockchain ecosystem and bitcoin.

6.    Throughout the Relevant Period, the Individual Defendants hid the truth from investors about Marathon's business, operations, and prospects. Specifically, the Individual Defendants withheld Marathon's true revenue figures from investors while claiming that materially misstated, publicly reported revenues were accurate to falsify an image of Marathon that differed from reality. The Company included these material misstatements in Marathon's proxy solicitations filed with the SEC during the Relevant Period, one of which solicited and received shareholder approval to amend a lucrative incentive plan that materially benefited the Individual Defendants, among others, at the Company. This approval by shareholders was based on false pretenses promoted by the Individual Defendants, including Marathon's actual financial performance and standing.

7.    The Individual Defendants concealed these control failures from investors, instead touting throughout the Relevant Period that Marathon maintained effective internal controls and disclosure controls over its financial reporting.

8.    The Company's improperly reported financial statements resulted in Marathon restating over a year's worth of its financial statements, resulting in significant losses for the Company.

9.    The truth emerged on February 28, 2023, when the Company announced "that it has cancelled its webcast and conference call for the fourth quarter and fiscal year 2022, initially scheduled

for today, February 28, 2023, at 4:30 p.m. Eastern time, and will postpone the publication of its corresponding financial results."

10.     On the same day, Marathon filed a Form 8-K with the SEC acknowledging that the Company received a letter from the SEC related to accounting issues in the Company's prior financial statements.

11.     Also on February 28, 2023, *Seeking Alpha* observed that because Marathon needed to restate its financial statements, the Company would not be able to timely file its 2022 annual report on Form 10-K. Later that day, the Company filed a notification of inability to timely file its annual report.

12.     On this news, the price of the Company's stock dropped from $7.10 per share at the close of trading on February 28, 2023, to $6.51 per share at the close of trading on March 1, 2023. This represented a loss in value of $0.59 per share, or 8.31%.

13.     On March 16, 2023, the Company filed its annual report on Form 10-K for the fiscal year ended December 31, 2022 ("FY21"), which included a restatement of, *inter alia*, the Company's reported Revenue Recognition, Impairment of Digital Assets, NYDIG Digital Assets Fund, III, LP, and other adjustments, including adjustments to income tax reports (the "Restatement"). The Restatement also included restated consolidated balance sheets as of December 31, 2021, related consolidated statements of operations, and consolidated statements of cash flows for FY21; restated unaudited condensed consolidated financial statements for the interim periods in 2022 and 2021 as reported in Marathon's quarterly reports filed on Forms 10-Q for the fiscal periods ended March, 31, 2021 and 2022, June 30, 2021 and 2022, and September 2021 and 2022; and an amended management's discussion and analysis of financial condition and results of operations related to FY21.

14.     The Restatement admitted the Company identified additional material weaknesses in the Company's internal controls over financial reporting during Marathon's review of all the above-

mentioned financial statements and admitted that Marathon still had unresolved SEC Staff Comments from 2022.

15.     During the Relevant Period, the Individual Defendants breached their fiduciary duties to Marathon and its shareholders by personally making and/or causing Marathon to make a series of materially false and misleading statements regarding Marathon's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused Marathon to make false and misleading statements that failed to disclose, *inter alia*, that: (i) Marathon materially misstated its revenue, cost of revenue, and other financial information in its 2021 and 2022 SEC filings; (ii) Marathon continuously downplayed its serious problems with internal controls; and (iii) because of this, the SEC would scrutinize Marathon, Marathon would need to restate several financial statements, and Marathon was reasonably likely to suffer significant damage, including reputational harm. As a result of the foregoing, Marathon's public statements were materially false and misleading at all relevant times.

16.     Moreover, one of the Individual Defendants breached their fiduciary duties by engaging in insider trading of Marathon common stock while the stock was at artificially inflated prices, resulting in one of the Individual Defendants receiving proceeds of over $3 million.

17.     In light of the Individual Defendants' misconduct—which has subjected Marathon, its former Chief Executive Officer ("CEO"), its former Chief Financial Officer ("CFO"), and its current CEO to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the District of Nevada (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, and the losses due to improper over-compensation of the Individual Defendants by the Company—the Company will have to expend many millions of dollars.

18.     Marathon has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

19.    Demand is excused as Marathon's Board of Directors (the "Board") cannot consider a demand to initiate litigation against themselves and the other Individual Defendants on behalf of Marathon with the requisite level of disinterestedness and independence required. In light of the breaches of fiduciary duties by the Individual Defendants', most of whom are Marathon's current directors, the Board's collective participation in fraud, the substantial likelihood of the Individual Defendants' liability in this derivative action, and the Individual Defendants likely liability in the Securities Class Action, and not being disinterested and/or independent directors, a majority of the Board cannot consider a demand.

## JURISDICTION AND VENUE

20.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9.

21.    Plaintiff's claims also raise a federal question pertaining to the claims made in the Consolidated Securities Class Action based on violations of the Exchange Act.

22.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

23.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

24.    The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who is a citizen of Nevada or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

25.    Venue is proper in this District because Marathon is incorporated in this District. In addition, a substantial portion of the transactions and wrongs complained of herein occurred in this

Verified Shareholder Derivative Complaint

District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

26.     Plaintiff is a current shareholder of Marathon and has continuously held Marathon common stock at all relevant times.

### Nominal Defendant Marathon

27.     Marathon is incorporated in Nevada and headquartered at 1010 SE 3rd Avenue, Suite 1200, Fort Lauderdale, Florida 33301. The Company's shares trade on the NASDAQ under the ticker "MARA."

### Defendant Thiel

28.     Defendant Frederick G. Thiel ("Thiel") has been Marathon's CEO since April 26, 2021, and has served as the Chairman of the Board since January 1, 2022. Prior to becoming CEO of Marathon, Defendant Thiel had been a Company director since April 24, 2018. According to the Marathon's Schedule 14A filed with the SEC on June 23, 2023 (the "2023 Proxy Statement"), Defendant Thiel beneficially owned 239,876 shares of Marathon's common stock as of June 16, 2023. At the close of trading on June 16, 2023, Marathon's stock price was $9.98, thus Defendant Thiel owned over $2.3 million worth of Marathon stock.

29.     Defendant Thiel's compensation for FY21 was $2,726,853, of which $500,000 was in salary, $500,000 was in bonuses, and $1,726,853 was in stock awards. For the fiscal year ended December 31, 2022 ("FY22"), Defendant Thiel's compensation was $1,240,249, of which $677,749 was in salary, and $562,500 was in bonuses.

### Defendant Okamoto

30.     Defendant Merrick Okamoto ("Okamoto") is the Company's former CEO, with his tenure being from December 2017 until his retirement on April 26, 2021. Defendant Okamoto started as a

Marathon director on August 11, 2017, and, on February 28, 2018, became the Executive Chairman. On December 31, 2021, Defendant Okamoto resigned as Executive Chairman. According to the Schedule 14A the Company filed with the SEC on June 16, 2021 (the "2021 Proxy Statement"), Defendant Okamoto beneficially owned 4,163,859 shares of the Company's common stock, constituting 4.19% of the total outstanding stock as of as of June 14, 2021. At the close of trading on June 14, 2021, the price of Marathon's stock was $29.94, thus Defendant Okamoto owned approximately $124.6 million worth of Marathon stock as of that date.

31.    Defendant Okamoto's compensation for FY21 was $143,781,988, of which $371,315 was in salary and $143,410,673 was in stock awards.

32.    During the period when the Company materially misstated information to investors to artificially inflate the stock price, and before to the scheme was exposed, Defendant Okamoto made the following sale of company stock:

| **Date** | **Shares Sold** | **Avg. Price Per Share** | **Proceeds** |
|---|---|---|---|
| December 28, 2021 | 83,333 | $37.02 | $3,084,987 |

Thus, in total, prior to the fraud being exposed, Defendant Okamoto sold 83,333 shares of Marathon common stock at artificially inflated prices on non-public, material insider information, for which he received approximately $3 million. His insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

**Defendant Salzman**

33.    Defendant Simeon Salzman ("Salzman") was Marathon's Chief Accounting Officer from March 31, 2022, until his resignation on November 21, 2022. Defendant Salzman previously served as CFO of Marathon from October 19, 2020, until March 31, 2022. According to the Company's Schedule 14A filed with the SEC on September 12, 2022 (the "2022 Proxy Statement"), Defendant Salzman beneficially owned 84,366 shares of Marathon's common stock. At the close of trading on September 12,

2022, Marathon's stock price was $14.43, thus Defendant Salzman owned over $1.2 million worth of Company stock.

34.    Defendant Salzman's compensation for FY21 was $700,000, of which $250,000 was in salary, $200,00 was in stock awards, and $250,000 was in bonuses.

**Defendant Gallagher**

35.    Defendant Hugh J. Gallagher ("Gallagher") was Marathon's CFO from March 31, 2022, until his retirement on May 12, 2023.

36.    Defendant Gallagher's compensation for FY22 was $4,797,517, of which $337,829 was in salary, $72,500 was in bonus awards, and $4,192,500 was in stock awards.[1]

**Defendant Antoun**

37.    Defendant Georges Antoun ("Antoun") has been a Company director since May 20, 2021. As a board member, Defendant Antoun serves as the chair of the Compensation Committee, and as a member of the Nominating and Corporate Governance Committee and of the Audit Committee. According to the 2023 Proxy Statement, Defendant Antoun beneficially owned 55,384 shares of the Company's common stock as of June 16, 2023. At the close of trading on June 16, 2023, Marathon's stock price was $9.98, thus Defendant Antoun owned over $552,732 worth of Company stock.

38.    Defendant Antoun's compensation for FY21 was $625,504, of which $27,198 was in fees earned, and $598,306 was in stock awards. Defendant Antoun's compensation for FY22 was $404,527, of which $138,750 was in fees earned, and $265,777 was in stock awards.

**Defendant DeNuccio**

39.    Defendant Kevin A. DeNuccio ("DeNuccio") has been a Company director since January 19, 2021. According to the 2023 Proxy Statement, Defendant DeNuccio beneficially owned 207,552 shares of the Company's common stock as of June 16, 2023. At the close of trading on June 16, 2023,

---

[1] Defendant Gallagher's 2021 compensation is not listed in Marathon's public filings.

Verified Shareholder Derivative Complaint

Marathon's stock price was $9.98, thus Defendant DeNuccio owned over $2 million worth of Company stock.

40.  Defendant Denuccio's compensation for FY21 was $759,572, of which $56,250 was in fees earned and $703,322 was in stock awards. Defendant DeNuccio's compensation for FY22 was $342,235, of which $76,458 was in fees earned and $265,777 was in stock awards.

**Defendant James**

41.  Defendant Sarita James ("James") has been a Company director since August 6, 2021. As a member of the board, Defendant James serves as the chair of the Nominating and Corporate Governance Committee. According to the 2023 Proxy Statement, Defendant James beneficially owned 37,519 shares of the Company's common stock as of June 16, 2023. At the close of trading on June 16, 2023, Marathon's stock price was $9.98, thus Defendant James owned over $374,439 worth of Company stock.

42.  Defendant James' compensation for FY21 was $535,487, of which $9,194 was in fees earned and $526,293 was in stock awards. Defendant James' compensation for FY22 was $373,069, of which $107,292 was in fees earned and $265,777 was in stock awards.

**Defendant Leupp**

43.  Defendant Jay Leupp ("Leupp") has been a Company director since May 20, 2021. As a board member, he serves as the chair of the Audit Committee, as a member of the Compensation Committee and the Nominating and Corporate Governance Committee. According to the 2023 Proxy Statement, Defendant Leupp beneficially owned 62,552 shares of the Company's common stock as of June 16, 2023. At the close of trading on June 16, 2023, Marathon's stock price was $9.98, thus Defendant Leupp owned approximately $624,268 worth of Company stock.

44.  Defendant Leupp's compensation for FY21 was $625,504, of which $27,198 was in fees earned and $598,306 was in stock awards. Defendant Leupp's compensation for FY22 was $404,527, of which $138,750 was in fees earned and $265,777 was in stock awards.

**Defendant Ouissal**

45.     Defendant Said Ouissal ("Ouissal") has been a Company director since August 6, 2021. As a board member, Defendant Ouissal serves as a member of the Nominating and Corporate Governance Committee, the Audit Committee, and the Compensation Committee. According to the 2023 Proxy Statement, Defendant Ouissal beneficially owned 30,217 shares of the Company's common stock as of June 16, 2023. At the close of trading on June 16, 2023, Ouissal's stock price was $9.98, thus Defendant Ouissal owned approximately $301,565 worth of Company stock.

46.     Defendant Ouissal's compensation for FY21 was $535,487, of which $9,194 was in fees earned and $526,293 was in stock awards. Defendant Ouissal's compensation for FY22 was $385,777, of which $120,000 was in fees earned and $265,777 was in stock awards.

**Defendant Mellinger**

47.     Defendant Doug Mellinger ("Mellinger") has been a Company director since March 31, 2022. According to the 2023 Proxy Statement, Defendant Mellinger beneficially owned 62,486 shares of Marathon's common stock as of June 16, 2023. At the close of trading on June 16, 2023, Marathon's stock price was $9.98, thus Defendant Mellinger owned approximately $623,610 worth of Company stock.

48.      Defendant Mellinger's compensation for FY22 was $285,663, of which $40,000 was in fees earned and $245,663 was in stock awards.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

49.     By reason of their positions as officers, directors, and/or fiduciaries of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed Marathon and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair,

just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders to benefit all shareholders equally.

50.    Each director and officer of the Marathon owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of Marathon and in the use and preservation of its property and assets and the highest obligations of fair dealing.

51.    The Individual Defendants' positions of control and authority as directors and/or officers of Marathon enabled them to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. To discharge their duties, the officers and directors of Marathon were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

52.    Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Marathon, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Marathon's Board at all relevant times.

53.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth,

operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

54.     To discharge their duties, the officers and directors of Marathon were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Marathon were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Nevada and the United States, and pursuant to Marathon's own Code of Business Conduct and Ethics ("Code of Ethics");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Marathon conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Marathon and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Marathon's operations would comply with all applicable

laws and Marathon's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

55.    Each of the Individual Defendants further owed to Marathon and the shareholders the duty of loyalty requiring that each favor Marathon's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

56.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Marathon and were at all times acting within the course and scope of such agency.

57.    Because of their advisory, executive, managerial, and directorial positions with Marathon, each of the Individual Defendants had access to adverse, non-public information about the Company.

58.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Marathon.

## **CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

59.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired

with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

60.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, and violations of the Exchange Act and (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls.

61.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Marathon was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

62.     Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

63.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Marathon and was at all times acting within the course and scope of such agency.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

64.     Marathon is a Nevada-incorporated company that digitally mines bitcoins and maintains principal offices in Fort Lauderdale, Florida and Irvine, California.

65.     In 2010, Marathon began under the name "Verve Ventures, Inc." Thereafter the Company changed its named to the "American Strategic Minerals Corporation" on December 7, 2011, and entered the business of uranium and vanadium exploration. The Company once again changed directions when, in June 2012, it stopped mineral exploration and began real estate investments in Southern California. In October 2012, the Company again changed directions and began operating an IP licensing business under the name "Marathon Patent Group, Inc."

66.     Thereafter, in 2017, the Company established a data center in Canada and purchased digital asset mining machines to begin mining digital assets. Just three years later, the Company closed its data center and operations in Canada and shifted its mining rigs and databases to the United States. In the US, the Company began to mine bitcoins. Thereafter, on March 1, 2021, the Company changed its name to Marathon. Currently, the Company's business operations center exclusively on bitcoin mining and other bitcoin related opportunities.

67.     Bitcoin is a cryptocurrency that implements a public, permanent, and decentralized ledger that allows users to exchange currency without the need for an intermediary, such as a bank. Bitcoin accomplishes these digital transactions through blockchain technology.

68.     Throughout the Relevant Period, and unbeknownst to the public and investors until February 2023, Marathon had used improper accounting methods to report its financial information to the SEC. Because of the Company's improper methods, Marathon's quarterly and annual reports filed between 2021 and 2022 contained numerous financial figures, results, and disclosures that were materially false and misleading.

69.     The Individual Defendants hid from the investing public that there were systemic control failures that led to substantial accounting errors. Instead, the Individual Defendants represented throughout the Relevant Period that Marathon was maintaining effective disclosure and internal controls over its financial reporting.

70.     Because of Marathon's erroneous financial reports, the Company was required by the SEC to restate over a year's wroth of financial statements, resulting in significant expenditures and losses for the Company, the extent of which remains uncertain.

## FALSE AND MISLEADING STATEMENTS

### *May 10, 2021 Press Release*

71.     On May 10, 2021, Marathon issued a press release regarding the Company's results for the first fiscal quarter of 2021. The press release stated:

> "As our financial and operational results for the first quarter demonstrate, 2021 is lining up to be a banner year for Marathon as we are transforming our business into one of the largest enterprise Bitcoin mining operations in North America during what is currently one of the most profitable mining environments in Bitcoin's history," said Fred Thiel, Marathon's CEO. "Since the start of 2021, we have taken several steps to establish Marathon as one of the leading pure-play Bitcoin investment opportunities by increasing our hashrate over 689%, rebranding our organization, and increasing our total bitcoin holdings to over 5,324 bitcoins. We have continued to build on that leadership position by becoming the first Bitcoin miner to produce bitcoin that is fully compliant anti-money laundering laws and OFAC's standards by directing all of our hashrate to the Marathon OFAC Pool. With new miners being delivered and installed every day, we remain on track to achieve 10.37 EH/s by early 2022, and we look forward to continuing to scale the business for the betterment of our shareholders and the broader Bitcoin ecosystem in the coming quarters.

> Marathon's chief financial officer, Sim Salzman, commented, "The first quarter marked a substantial improvement in our financial performance as we grew revenues to $9.2 million, generated net income of $83.4 million, and earned $137.4 million in adjusted EBITDA. Additionally, we exited the quarter with $211.9 million in cash and with a total liquidity, defined as cash and bitcoin holdings, of approximately $504.5 million. While Bitcoin's future price and the network difficulty rate are subject to change, we believe Marathon's financial performance will continue to improve as more miners come online, increasing our ability to generate revenues and yielding better economies of scale, which will drive profitability."

### *May 10, 2021 10-Q*

72.     Alongside the press release, Marathon filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended March 31, 2021 (the "1Q21 Report"). The 1Q21 Report was signed by Defendants Thiel and Salzman. Additionally, it contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Thiel and Salzman attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

73.     With respect to the Company's controls and procedures, the 1Q21 Report stated the following:

> Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. Our management is also required to assess and report on the effectiveness of our internal control over financial reporting in accordance with Section 404 of the Sarbanes-Oxley Act of 2002 ("Section 404"). Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes of accounting principles generally accepted in the United States. Management assessed the effectiveness of our internal control over financial reporting as of March 31, 2021. In making this assessment, we used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control - Integrated Framework in the 2013 COSO framework. ***Based on this assessment, management concluded that our disclosure controls and procedures were effective***.
>
>                                       \*\*\*
>
> As part of our ongoing program to implement changes and further improve our internal controls and in conjunction with our Code of Ethics, our independent directors have been working with management to include protocols and measures aimed at ensuring quality of our internal controls. Among those measures is the implementation of a whistleblower hotline, which allows third parties to anonymously report noncompliant activity.

(Emphasis added.)

74.     The 1Q21 Report also reported Marathon's total revenues, impairment of digital assets, including gains and losses in connection with Marathon's investment in the NYDIG Digital Assets Fund III, LP ("Fund"), accruals for legal expenses, valuation of bifurcated derivatives related to certain

investments, accumulated comprehensive income and other income, classification of prepaid expenses between short and long term, among other financial line items.

### June 16, 2021 Proxy Statement

75.     On June 16, 2021, Marathon filed the 2021 Proxy Statement. The 2021 Proxy was solicited by Defendants Okamoto, Thiel, Antoun, Leupp, and DeNuccio, and it was filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

76.     Regarding the Company's Code of Business Conduct and Ethics (the "Code of Ethics") and corporate governance, the 2021 Proxy Statement stated:

> We are committed to maintaining strong corporate governance practices that benefit the long-term interests of our shareholders by providing for effective oversight and management of the Company. Our governance policies, including a Code of Business Conduct and Ethics ("Code") can be found on our website at www.marathonpg.com by following the link to "Investors" and then to "Governance Docs."

> Our Code of Business Conduct and Ethics, effective December 2017, applies to directors, executive officers and employees of the Company. This Code is intended to focus the directors, executive officers and employees on areas of ethical risk, provide guidance to directors, executive officers and employees to help them recognize and deal with ethical issues, provide mechanisms to report unethical conduct, and help foster a culture of honesty and accountability. Each director, executive officer and employee must comply with the letter and spirit of this Code.

> We require that Directors and executive officers must be loyal to the Company and must act at all times in the best interest of the Company and its shareholders and subordinate self-interest to the corporate and shareholder good. Directors and executive officers should never use their position to make a personal profit. Directors and executive officers must perform their duties in good faith, with sound business judgment and with the care of a prudent person.

77.     Regarding Risk Oversight, the 2021 Proxy Statement stated:

> Our Board is primarily responsible for overseeing our risk management processes. The Board receives and reviews periodic reports from management, auditors, legal counsel, and others, as considered appropriate regarding the Company's assessment of risks. The Board focuses on the most significant risks facing the Company and our general risk management strategy, and also ensures that risks undertaken by us are consistent with the Board's risk parameters. While the Board oversees the Company, our management is responsible for day-to-day risk management processes. We believe this division of responsibilities is the most effective approach for addressing the risks facing the Company and that our board leadership structure supports this approach.

78.     Additionally, the 2021 Proxy Statement called for shareholders to approve, among other things, the election of directors Thiel, DeNuccio, Ouissal, and James, an amendment to the Company's 2018 Equity Incentive Plan (the "Plan") to increase the number of shares available by 7,500,000 shares, and the ratification of RBSM, LLP as the Company's registered public accountant for the fiscal year ended December 31, 2021. The Plan, originally approved in 2018, provided for stock options, restricted stock, preferred stock, stock-based awards, and other awards to incentivize employees, directors, consultants, advisors, and other service providers. The 2021 Proxy Statement disclosed that there were no shares of common stock remaining to be issued under the Plan.

79.     The 2021 Proxy Statement was false and misleading because, contrary to assertions made, the Company's Code of Ethics and other governance policies were not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Ethics.

80.     The 2021 Proxy Statement also failed to disclose, *inter alia*, that: that: (i) Marathon materially misstated its revenue, cost of revenue, and other financial information in its 2021 and 2022 SEC filings; (ii) Marathon continuously downplayed its serious problems with internal controls; and (iii) because of this, the SEC would scrutinize Marathon, Marathon would need to restate several financial statements, and Marathon was reasonably likely to suffer significant damage, including reputational harm. As a result of the foregoing, Marathon's public statements were materially false and misleading at all relevant times.

81.     As a result of the material misstatements and omissions contained in the 2021 Proxy Statement, Marathon shareholders elected and reelected Board members who were violating their fiduciary duties, which enabled the Individual Defendants to continue their misconduct and increase the

number of shares available in the Plan by 7,500,000 shares, among other things. This allowed the Individual Defendants and others at the Company to unjustly and materially benefit therefrom.

***August 13, 2021 Press Release***

82.     On August 13, 2021, the Company issued a press release regarding the results of Marathon's second fiscal quarter of 2021. The press release stated the following:

> Marathon's CFO, Sim Salzman, commented, "When comparing Q2 2021 to Q1 2021, we grew our revenues by 220% to $29.3 million while generating non-GAAP operating income of $20.1 million. We exited the quarter with $170.6 million in cash and with a total liquidity, defined as cash and bitcoin holdings, of approximately $366.5 million. Given the number of non-cash items that impact our financial results, including but not limited to depreciation expense and impairments on our mined bitcoin holdings, we have introduced non-GAAP operating income. This metric portrays an operational equivalent to our formerly reported metric, adjusted EBITDA, and we believe it will help investors more objectively track our financial progress. Bitcoin's future price and the network difficulty rate are subject to change. However, we maintain our belief that Marathon's financial performance will continue to improve as more miners come online, increasing our probability of earning bitcoin."

***August 13, 2021 Form 10-Q***

83.     Alongside the press release, the Company filed on August 13, 2021, its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended June 30, 2021 (the "2Q21 Report"). Defendants Thiel and Salzman signed the 2Q21 Report. Included in the 2Q21 Report were SOX certifications, which were signed by Defendants Thiel and Salzman attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to Marathon's internal controls, and the disclosure of any fraud committed by Marathon, its officers, or its directors.

84.     Regarding Marathon's internal controls, the 2Q21 Report stated the following:

> Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. Our management is also required to assess and report on the effectiveness of our internal control over financial reporting in accordance with Section 404 of the Sarbanes-Oxley Act of 2002 ("Section 404"). Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes of accounting principles generally accepted in the United States. Management assessed the effectiveness

of our internal control over financial reporting as of June 30, 2021. In making this assessment, we used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control - Integrated Framework in the 2013 COSO framework. ***Based on this assessment, management concluded that our disclosure controls and procedures were effective***.

\*\*\*

As part of our ongoing program to implement changes and further improve our internal controls and in conjunction with our Code of Ethics, our independent directors have been working with management to include protocols and measures aimed at ensuring quality of our internal controls. Among those measures is the implementation of a whistleblower hotline, which allows third parties to anonymously report noncompliant activity.

(Emphasis added.)

85.     The 2Q21 Report also stated Marathon's total revenues, impairment of digital assets, including gains and losses in connection with Marathon's investment in the Fund, accruals for legal expenses, valuation of bifurcated derivatives related to certain investments, accumulated comprehensive income and other income, classification of prepaid expenses between short and long term, among other financial line items.

### *November 10, 2021 Press Release*

86.     On November 10, 2021, Marathon issued a press release regarding the financial results of Marathon's third fiscal quarter of 2021. The press release stated the following:

Marathon's CFO, Sim Salzman, commented, "With our increased hash rate and bitcoin's price appreciating, we grew our revenues 76% quarter-over-quarter from $29.3 million in the second quarter of 2021 to $51.7 million in the third quarter of 2021. This growth coupled with our efficient operations allowed us to generate non-GAAP income from operations of $43.5 million, or $0.43 per diluted share. Additionally, our non-GAAP net income, which excludes non-cash items and includes the change in fair value of our investment fund, was $85.4 million, or $0.85 per diluted share, as the increase in bitcoin's price drove our investment fund to appreciate as well. We exited the quarter with $32.9 million in cash and with total liquidity of approximately $315.6 million. Subsequent to the quarter's end, we obtained a $100 million line of credit, secured by our bitcoin holdings and USD, which further strengthened our liquidity position. Given our track record and growth trajectory, we maintain our position that Marathon's financial performance will continue to improve as we focus on efficiently increasing our hash rate."

### *November 15, 2021 10-Q*

87.    On November 15, 2021, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended September 30, 2021 (the "3Q21 Report"). Defendants Thiel and Salzman signed the 3Q21 Report, which contained SOX certifications also signed by Defendants Thiel and Salzman attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

88.    Regarding Marathon's internal controls, the 3Q21 Report stated the following:

Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. Our management is also required to assess and report on the effectiveness of our internal control over financial reporting in accordance with Section 404 of the Sarbanes-Oxley Act of 2002 ("Section 404"). Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes of accounting principles generally accepted in the United States. Management assessed the effectiveness of our internal control over financial reporting as of September 30, 2021. In making this assessment, we used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control - Integrated Framework in the 2013 COSO framework. ***Based on this assessment, management concluded that our disclosure controls and procedures were effective***.

***

As part of our ongoing program to implement changes and further improve our internal controls and in conjunction with our Code of Ethics, our independent directors have been working with management to include protocols and measures aimed at ensuring quality of our internal controls. Among those measures is the implementation of a whistleblower hotline, which allows third parties to anonymously report noncompliant activity.

(Emphasis added.)

89.    The 3Q21 Report also stated Marathon's total revenues, impairment of digital assets, including gains and losses in connection with Marathon's investment in the Fund, accruals for legal expenses, valuation of bifurcated derivatives related to certain investments, accumulated comprehensive income and other income, classification of prepaid expenses between short and long term, among other financial line items.

***March 1, 2022 Press Release and Notification of Inability to Timely File 10-K***

90.     On March 1, 2022, Marathon issued a press release announcing Marathon's financial results for the fourth quarter of 2021 and FY21. The press release stated the following:

"Our primary objectives for 2022 are to effectively deploy our miners, achieve our growth targets, and continue expanding our competitive moat. Deploying at scale behind the meter involves breaking some new ground, and now that we have overcome some of those initial hurdles, we expect deployments to accelerate this quarter and throughout the rest of the year. We believe Marathon remains well positioned to generate approximately 23.3 Eh/s and for our mining operations to be 100% carbon neutral by early 2023. We look forward to another strong year for Marathon as we continue our mission of supporting the adoption, security, and evolution of Bitcoin by building one of the largest, most agile, and most sustainably operated Bitcoin mining operations in the world.

Marathon's CFO, Sim Salzman, commented, "In 2021, we grew our revenues 3,353% year-over-year to $150.5 million. Due to the leverage in our business model, we produced non-GAAP income from operations of $118.7 million and non-GAAP net income of $168.7 million, or $1.70 per diluted share, during the same time period. In the fourth quarter, we achieved two financial milestones that strengthened our liquidity position. We obtained a $100 million line of credit secured by our bitcoin holdings, and we raised approximately $747.5 million in a convertible note offering in which the notes are unsecured and the coupon rate is 1%. Given the strength of our business model, our track record of efficiently capitalizing on market events, and our current growth trajectory, we continue to believe that our financial and operational performance will continue to improve as we focus on efficiently increasing our hash rate."

91.     On the same day, Marathon filed a Notification of Inability to Timely File its annual report on Form 10-K with the SEC on Form 12b-25. According to the notice, the Company's independent registered accounting firm experienced a delay in completing the audit of Marathon's financial statements for FY21 because of: "(i) the significant increase in amount and complexity of revenues in 2021 over 2020, (ii) the Company's transition to large accelerated filer status, shortening filing deadlines by 30 days, and (iii) the Company's first year of being audited for internal controls." Marathon stated it expected to file its 10-K within 15 days of the due date.

***March 10, 2022 10-K***

92.     On March 10, 2022, Marathon filed with the SEC its annual report for FY21 on Form 10-K (the "2021 10-K"). Defendants Thiel, Salzman, Ouissal, Leupp, Antoun, DeNuccio, and James signed

the 2021 10-K. Additionally, Defendants Thiel and Salzman signed the SOX certifications contained within that attested the 2021 10-K's financial accuracy.

93.    Included in the 2021 10-K was an adverse opinion by Marcum LLP about the material weaknesses that had been identified in Marathon's internal financial controls. For example, the 2021 10-K disclosed the following about management's assessment of Marathon's internal controls:

> Management assessed the effectiveness of our internal control over financial reporting as of December 31, 2021. In making this assessment, we used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in Internal Control - Integrated Framework in the 2013 COSO framework. Based on this evaluation, management identified a weakness in internal control over financial reporting related to Information Technology General Controls (ITGC). Specifically, the Company did not design and/or implement user access controls to ensure appropriate segregation of duties or program change management controls for certain financially relevant systems impacting the Company's processes around revenue recognition and digital assets to ensure that IT program and data changes affecting the Company's (i) financial IT applications, (ii) digital currency mining equipment, and (iii) underlying accounting records, are identified, tested, authorized and implemented appropriately to validate that data produced by its relevant IT system(s) were complete and accurate. Automated process-level controls and manual controls that are dependent upon the information derived from such financially relevant systems were also determined to be ineffective as a result of such deficiency. In addition, the Company has not effectively designed a manual key control to detect material misstatements in revenue.

> The material weakness described above did not result in a material misstatement to the Company's previously issued consolidated financial statements, nor in the consolidated financial statements included in this Annual Report on Form 10-K.

94.    The 2021 10-K also reported Marathon's Consolidated Balance Sheets, Statements of Operations and Cash Flows for FY21. The 2021 10-K stated that the Company had $268,522 in cash and cash equivalents, $102,806 in digital assets, $223,779 in digital assets held in the Fund, and $1,448,245 in total liabilities and stockholders' equity. These amounts (among other line items) were incorrect and would later have to be restated. In reality, the total liabilities and stockholders' equity the Company had for FY21 was $1,444,331.

***May 4, 2022 Press Release***

95.    On May 4, 2022, Marathon issued a press release reporting its financial results for the first quarter of 2022. The press release stated the following:

**First Quarter 2022 Financial Results**
Revenue increased to $51.7 million, an increase of $42.6 million, or 465%, from the prior-year quarter and a decrease of $8.6 million, or 14%, from the fourth quarter of 2021. Bitcoin production increased to 1,259 bitcoin during the period, a 556% increase from the prior-year quarter and a 15% increase from the fourth quarter of 2021. The revenue decline from the fourth quarter of 2021 was the result of an approximate 25% decrease in average revenue per bitcoin mined, partially offset by the increase in bitcoin production during the first quarter of 2022.

*** 

"In the first quarter of 2022, we increased our bitcoin production 556% year-over-year and 15% from the prior quarter, producing a record 1,259 bitcoin even as the global hash rate rose by approximately 17% in the same period," said Fred Thiel, Marathon's chairman and CEO. "At Marathon, we are constantly pushing boundaries to propel our business and our industry forward, but as the first quarter and subsequent events have demonstrated, not every industry operates at the same pace as we do. Innovation is not a linear process, and in the first quarter, we experienced regulatory friction related to breaking the mold on deploying our miners behind the meter at power facilities operated by some of the largest renewable energy companies in the United States. As a result, our deployment schedule shifted by 45 days in the first quarter. Encouragingly, in March, the grid operators in Texas granted permission for all 280 megawatts of the first major facility in Texas to be energized. Currently, the pace of deployment is predominantly determined by the pace of construction, which continued unimpeded as we worked through the regulatory and permitting friction.

"Our primary focus for 2022 remains the deployment of our miners. This year is all about execution. Given the progress we have made to date in deploying behind the meter, we believe we will be through our backlog of miners and fully back on track with deployments before the end of this year, keeping us on pace to reach 23.3 EH/s by early 2023. We believe 2022 will be transformational for Marathon as we are in the process of deploying nearly 200,000 miners and transitioning our operations to be 100% carbon neutral."

*May 4, 2022 Conference Call*

96.    Alongside the press release, Marathon held an earnings conference call to discuss the results of the first fiscal quarter of 2022. During the call, Defendant Thiel stated:

Some strategic and operational highlights. In Q1, we made substantial progress, strengthening Marathon's competitive advantages to expand our position as the leading Bitcoin miner in North America. A year ago, when I transitioned from the Board of Directors to become CEO, we had 12,000 miners operating. Our hash rate was 1.3x hash and Marathon consisted of 4 full-time employees. Today, we have approximately 37,000 miners installed. Our hash rate is more than 3x higher and we have 15 full-time employees.

Most of whom are in senior level positions that extend across technology, operations, strategy and finance.

***May 6, 2022 10-Q***

97. On May 6, 2022, Marathon filed with the SEC its quarterly report on Form 10-Q for the fiscal quarter ended March 31, 2022 (the "1Q22 Report"). Defendants Thiel and Gallagher signed the 1Q22 Report. Contained within the 1Q22 Report were SOX certifications that Defendants Thiel and Gallagher had signed attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

98. Regarding Marathon's controls and procedures, the 1Q22 Report acknowledged that disclosure controls were ineffective, stating the following:

> Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. Our management is also required to assess and report on the effectiveness of our internal control over financial reporting in accordance with Section 404 of the Sarbanes-Oxley Act of 2002 ("Section 404"). Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes of accounting principles generally accepted in the United States. Management assessed the effectiveness of our internal control over financial reporting as of March 31, 2022. In making this assessment, we used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control - Integrated Framework in the 2013 COSO framework. Based on this assessment, management concluded that our disclosure controls and procedures were not effective as of March 31, 2022 for the reasons stated in our Annual Report on Form 10-K for the year ended December 31, 2021.

99. And yet, the Company continued to conceal the true extent of the deficiencies in its financial reporting from investors. The 1Q22 Report also reported Marathon's total revenues, operating expenses, net losses, impairment of digital assets, realized and unrealized gains on digital assets held in the Fund, and income taxes, among other financial line items.

***August 8, 2022 Press Release***

100.    On August 8, 2022, the Company issued a press release about Marathon's financial results for the second fiscal quarter of 2022,  and announced updates about its bitcoin and digital asset mining operation for July 2022. The press release stated the following, in relevant part:

"In the second quarter of 2022, we increased our bitcoin production 8% year-over-year, producing 707 bitcoin, and we continued to install miners in Texas in anticipation of energization as we worked through both operational obstacles and a challenging macro environment," said Fred Thiel Marathon's chairman and CEO. "Energization delays, maintenance and weather issues in Montana, and an approximately 56% decline in the price of bitcoin during the quarter, severely impacted our bitcoin production and financial results. These items reduced our revenues, caused us to record a $127.6 million impairment on our bitcoin holdings, and decreased the fair market value of our investment fund by $79.7 million. However, given the groundwork we laid during the quarter and the progress we have made since, we are optimistic that Marathon's operational and financial positioning is improving.

***August 8, 2022 Conference Call***

101.    Also on August 8, 2022, the Company held an earnings conference call discuss the financial results of the second fiscal quarter of 2022. Defendant Thiel stated during the call the following:

The second quarter tested our resilience and our resourcefulness. As a result, even as recent events have demonstrated, we not only weathered the difficult times, but we capitalized on opportunities to improve our operational and financial position subsequent to the quarter's end.

\*\*\*

In summary, the second quarter was challenging for the industry and for Marathon in particular. Bitcoin mining is a nascent industry, and as I mentioned in our last call, there is no playbook. However, given our progress, we're confident that we remain on track to grow our position as a leader in this space. Miners are coming online in Texas. We have hosting arrangements secured to achieve our target of 23.3 exahash by mid-next year. Our mining fleet is state-of-the-art, consisting predominantly of the most efficient bitcoin miners available in the market. We have a warchest big point in our liquidity position, balance sheet continued to improve.

Overall, we have entered the second half of the year with added confidence that we remain on track to grow our position as a leader in supporting and securing the bitcoin ecosystem.

***August 9, 2022 10-Q***

102.    On August 9, 2022, Marathon filed with the SEC its quarterly report on Form 10-Q for the fiscal quarter ended June 30, 2022 (the "2Q22 Report"). Defendants Thiel and Salzman signed the

2Q22 Report. Contained within the 2Q22 Report were SOX certifications signed by Defendants Thiel and Gallagher attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

103.    Regarding Marathon's controls and procedures, the 2Q22 Report acknowledged that disclosure controls were ineffective, stating:

> Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. Our management is also required to assess and report on the effectiveness of our internal control over financial reporting in accordance with Section 404 of the Sarbanes-Oxley Act of 2002 ("Section 404"). Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes of accounting principles generally accepted in the United States. Management assessed the effectiveness of our internal control over financial reporting as of June 30, 2022. In making this assessment, we used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control - Integrated Framework in the 2013 COSO framework. Based on this assessment, management concluded that our disclosure controls and procedures were not effective as of June 30, 2022 for the reasons stated in our Annual Report on Form 10-K for the year ended December 31, 2021.

104.    And yet, the Company continued to conceal the true extent of the deficiencies in its financial reporting from investors.  The 2Q22 Report also stated Marathon's total revenues, operating expenses, net losses, impairment of digital assets, realized and unrealized gains on digital assets held in the Fund, and income taxes, among other financial line items.

### *September 12, 2022 Proxy Statement*

105.    On September 12, 2022, Marathon filed with the SEC the 2022 Proxy Statement. The 2022 Proxy Statement was solicited by Defendants Thiel, Antoun, DeNuccio, Leupp, James, Ouissal, and Mellinger and filed pursuant to Section 14(a) of the Exchange Act. The 2022 Proxy Statement contained material misstatements and omissions.

106.    Regarding Marathon's Code of Ethics and corporate governance, the 2022 Proxy Statement stated:

We are committed to maintaining strong corporate governance practices that benefit the long-term interests of our shareholders by providing for effective oversight and management of the Company. Our governance policies, including a Code of Business Conduct and Ethics ("Code") can be found on our website at www.marathonpg.com by following the link to "Investors" and then to "Governance Docs."

Our Code of Business Conduct and Ethics, effective December 2017, applies to directors, executive officers and employees of the Company. This Code is intended to focus the directors, executive officers and employees on areas of ethical risk, provide guidance to directors, executive officers and employees to help them recognize and deal with ethical issues, provide mechanisms to report unethical conduct, and help foster a culture of honesty and accountability. Each director, executive officer and employee must comply with the letter and spirit of this Code.

We require that Directors and executive officers must be loyal to the Company and must act at all times in the best interest of the Company and its shareholders and subordinate self-interest to the corporate and shareholder good. Directors and executive officers should never use their position to make a personal profit. Directors and executive officers must perform their duties in good faith, with sound business judgment and with the care of a prudent person.

107.    Regarding Risk Oversight, the 2022 Proxy Statement stated:

Our Board is primarily responsible for overseeing our risk management processes. The Board receives and reviews periodic reports from management, auditors, legal counsel, and others, as considered appropriate regarding the Company's assessment of risks. The Board focuses on the most significant risks facing the Company and our general risk management strategy, and also ensures that risks undertaken by us are consistent with the Board's risk parameters. While the Board oversees the Company, our management is responsible for day-to-day risk management processes. We believe this division of responsibilities is the most effective approach for addressing the risks facing the Company and that our board leadership structure supports this approach.

108.    The 2022 Proxy Statement also called for shareholders to approve, among other things, the election of directors Antoun and Leupp, the increase of Marathon's authorized shares of common stock from 200 million to 300 million, and the ratification of Marcum LLP as Marathon's registered public accountant for FY22.

109.    The 2022 Proxy Statement was false and misleading because, despite assertions to the contrary, the Company's Code of Ethics and other governance policies were not followed, as evidenced

by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Ethics.

110.    The 2022 Proxy Statement also failed to disclose, *inter alia*, that: (i) Marathon materially misstated its revenue, cost of revenue, and other financial information in its 2021 and 2022 SEC filings; (ii) Marathon continuously downplayed its serious problems with internal controls; and (iii) because of this, the SEC would scrutinize Marathon, Marathon would need to restate several financial statements, and Marathon was reasonably likely to suffer significant damage, including reputational harm. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

111.    As a result of the material misstatements and omissions contained in the 2022 Proxy Statement, Company shareholders elected and reelected Board members who were violating their fiduciary duties, thereby enabling the Individual Defendants to perpetuate their misconduct and increased the Company's authorized shares of common stock from 200 million to 300 million, among other things.

***November 8, 2022 Press Release***

112.    On November 8, 2022, Marathon issued a press release addressing the financial results of its third fiscal quarter of 2022.  The press release stated:

"The third quarter of 2022 was a transition and rebuilding period at Marathon, during which we fully exited the Hardin facility in Montana and began energizing servers at new locations, most notably the 280-megawatt data center that resides behind the meter at the King Mountain wind farm in McCamey, Texas," said Fred Thiel, Marathon's chairman and CEO. "We sequentially improved our bitcoin production each month during the quarter as we rebuilt our hash rate from approximately 0.7 exahashes per second in early July to 3.8 exahashes per second by September 30. This progress continued subsequent to the quarter's end as we increased our hash rate an additional 84% to approximately 7 exahashes per second by November 1. We also realized our highest production month to date in October when we produced 615 bitcoin, nearly equal to our entire production during the third quarter.

"We believe Marathon has a strong foundation on which we can continue to build our hash rate. Our near-term goal is to reach approximately 9.0 exahashes per second by the end of the year, and we continue to target 23 exahashes per second near the middle of 2023 as we

strive to establish our position as a leader in supporting and securing the bitcoin ecosystem."

***November 8, 2022 Conference Call***

113.    Also on November 8, 2022, Marathon held an earnings conference to discuss the results of the third quarter of 2022. During the call, Defendant Thiel stated the following:

> The third quarter was a transition and rebuilding period at Marathon. With the facility in Hardin, Montana off-line and energization of miners in Texas delayed, we entered the third quarter with only 6,000 miners operational, producing approximately 0.7x exahashes per second. Unsurprisingly, the operational transition that occurred during the third quarter caused our financial results to dip both quarter-over-quarter and year-over-year. However, as our consistently improving Bitcoin production substantiates, our confidence in our ability to rebuild our hash rate while maintaining a healthy balance sheet was well founded. Today, we believe Marathon is a strong foundation on which we can continue to efficiently grow towards our goal of 23 exahashes per second by mid-2023, and expand our position as the leader in securing and supporting the Bitcoin ecosystem.

***November 14, 2022 10-Q***

114.    On November 14, 2022, Marathon belatedly filed with the SEC its quarterly report on Form 10-Q for the fiscal quarter ended September 30, 2022 (the "3Q22 Report"). Defendants Thiel and Gallagher signed the 3Q22 Report. Contained within it were SOX certifications signed by Defendants Thiel and Gallagher attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

115.    Regarding Marathon's controls and procedures, the 3Q22 Report acknowledged that the Company's disclosure controls were ineffective, stating:

> Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. Our management is also required to assess and report on the effectiveness of our internal control over financial reporting in accordance with Section 404 of the Sarbanes-Oxley Act of 2002 ("Section 404"). Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes of accounting principles generally accepted in the United States. Management assessed the effectiveness of our internal control over financial reporting as of September 30, 2022. In making this

assessment, we used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control – Integrated Framework in the 2013 COSO framework. Based on this assessment, management concluded that our disclosure controls and procedures were not effective as of September 30, 2022 for the reasons stated in our Annual Report on Form 10-K for the year ended December 31, 2021.

116.    And yet, the Company continued to conceal the true extent of the deficiencies in its financial reporting from investors.  The 3Q22 Report also stated Marathon's total revenues, operating expenses, net losses, impairment of digital assets, realized and unrealized gains on digital assets held in the Fund, and income taxes, among other financial line items.

117.    The statements identified above were materially false and misleading, and/or failed to disclose the necessary material facts to make the above statements not false and misleading. Specifically, the Individual Defendants willfully or recklessly made and/or caused Marathon to make false and misleading statements that failed to disclose, *inter alia*, that: (i) Marathon materially misstated its revenue, cost of revenue, and other financial information in its 2021 and 2022 SEC filings; (ii) Marathon continuously downplayed its serious problems with internal controls; and (iii) because of this, the SEC would scrutinize Marathon, Marathon would need to restate several financial statements, and Marathon was reasonably likely to suffer significant damage, including reputational harm. As a result of the foregoing, Marathon's public statements were materially false and misleading at all relevant times.

### **The Truth Emerges**

118.    On February 28, 2023, the Company announced in a press release "that it has cancelled its webcast and conference call for the fourth quarter and fiscal year 2022, initially scheduled for today, February 28, 2023, at 4:30 p.m. Eastern time, and will postpone the publication of its corresponding financial results."

119.    Alongside the press release, the Company filed with the SEC a Form 8-K acknowledging Marathon received a letter from the SEC regarding the substantial accounting issues in the Company's prior financial statements. The 8-K stated:

On February 27, 2023, the Company's Audit Committee of the Board of Directors, after consultation with Marcum LLP, the Company's independent auditor, concluded that due to certain accounting errors, as described below, the previously issued audited consolidated financial statements contained in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2021 and the previously issued unaudited condensed consolidated financial statements for the interim periods in 2022 and 2021 as contained in the Company's Quarterly Reports on Form 10-Q for the fiscal periods ended March 31, 2021 and 2022, June 30, 2021 and 2022 and September 30, 2021 and 2022 (the "Impacted Financial Statements") should no longer be relied upon. Similarly, related earnings releases and other financial communications for these periods should no longer be relied upon. The Company intends to correct the errors and will be restating the Impacted Financial Statements.

120.    Further on February 28, 2023, *Seeking Alpha* noted that because the Company will need to restate its financial statements, the Company would not be able to timely file its 2022 annual report on Form 10-K, among other things. The *Seeking Alpha* article stated:

Marathon [. . .] said Tuesday it will restate its full year 2021 and quarterly earnings for that year and for the first three quarters of 2022 due to accounting errors.

Specifically, the bitcoin miner determined that it had incorrectly calculated impairment on a daily basis of its digital assets and it had incorrectly accounted for revenue from a bitcoin mining pool that it had participated in and operated in late 2021 and early 2022.
Now that Marathon [] needs to restate its previously reported financial statements for 2021 and 2022, the company will not be able to file its 2022 annual 10-K statement by the filing deadline of March 1, it said in a filing. It cancelled its conference call for Q4 earnings and will postpone the publication of its financial results.

The company said its method for calculating the impairment of digital assets, chiefly bitcoin [], on a daily basis using a standard cutoff time wasn't in compliance with a requirement that calls for the intraday low price to be used.

Regarding the bitcoin mining pool's revenue recognition, Marathon [] had determined that the company acted as an agent in the pool, which included a small number of unrelated third-party participants. As a result, it recorded revenue on a net basis, subtracting any revenue allocated to the third-party pool participants from its revenue as the operator of the pool.

It later found out that its assessment was incorrect and should have concluded that it acted as principal. That means the company should have recorded gross revenue rather than net revenue.

Marathon [] now estimates that both its revenue and cost of revenue for the year ended Dec. 31, 2021 were understated. Revenue and cost of revenue, energy, hosting and other, are expected to increase in the restated 2021 numbers.

The restatement of the impacted financial statement isn't expected to have any effect on total margin, operating income or net income in 2021 or any of the interim periods in 2021 or 2022, it said.

Marathon [] also said it no longer operates a pool that includes third parties.

The company was expected to post a Q4 loss per share of $0.17 and revenue of $33.98M, according to consensus estimates.

121.    On this news, the price of Marathon's stock dropped from $7.10 per share at the close of trading on February 28, 2023, to $6.51 per share at the close of trading on March 1, 2023, representing a decrease of $0.59 per share or a loss in value of 8.31%.

122.    On March 16, 2023, Marathon filed the Restatement. The Restatement included restated Consolidated Balance Sheets as of December 31, 2021, restated Consolidated Statements of Operations, and Consolidated Statements of Cash Flows for FY21; restated unaudited condensed consolidated financial statements for the interim periods in 2022 and 2021 contained in Marathon's quarterly reports filed on Forms 10-Q for the fiscal periods ended March 31, 2021 and 2022, June 30, 2021 and 2022, and September 30, 2021 and 2022, and an amended Management's Discussion and Analysis of Financial Condition and Results of Operations related to FY21. The Restatement purported to correct Marathon's reports for Revenue Recognition – Principal versus Agent, Impairment of Digital Assets, NYDIG Digital Assets related to the Fund, Disposal of Assets, Other Adjustments, and related income tax adjustments.

123.    The Restatement also revealed that the Company discovered additional material weaknesses in its internal controls over its financial reporting during its internal investigation.

124.    Further, the Restatement disclosed that several of the SEC's comments regarding the Company's financial statements remained unresolved despite the Company's restatement. As such, the Company may be forced to further restate its financial statements. The Restatement outlined the following unresolved SEC Staff Comments:

● Revenue recognition. The Staff commented on the Company's revenue recognition policy in its capacity as a pool operator and in its capacity as a pool participant, with specific attention on the Company's previous net recognition of revenue as an operator of

a pool. The Company has, in the restated financial results, revised its revenue to include gross revenue earned as pool operator with any amounts remitted to third party pool participants as cost of revenue. The Staff further commented on the Company's accounting convention to recognize its noncash (bitcoin) revenue using fair value that is not at contract inception. The Company has evaluated the difference between its current accounting policy and fair value at contract inception and has determined that any differences in revenue are not material for all periods stated.

● Impairment of bitcoin. The Staff objected to the Company's calculation of impairment of bitcoin using a daily closing price. The Company has, in the restated financial results, revised its calculation to calculate impairment of bitcoin using the intraday low price of bitcoin.

● Accounting for investment fund. The Staff commented on whether the Company should have consolidated an investment fund in which the Company was the sole limited partner and, if so, whether its accounting for the income and expenses of the investment fund were appropriately classified within the Company's Statements of Other Comprehensive Income (Loss). The Company has since determined it would consolidate the NYDIG Fund and updated its classification of income and expenses of the investment fund within the Statements of Other Comprehensive Income (Loss) as part of the restated financial results.

● Statements of Other Comprehensive Income (Loss) Presentation. The Staff has commented on the classification and inclusion of certain items in loss from operation versus in other income (expense). These items include realized gain (loss) on sales of digital assets, interest income, impairment on digital assets and patents, and gain on sale of equipment. The Company has since revised its presentation prospectively, and in the restated financial results.

● Embedded leases in Hosting and Power Arrangements. The Staff has asked the Company for a comprehensive analysis around whether each of its server hosting arrangements contain embedded leases. The Company has provided such analysis and included any required disclosure as a result of such analysis in the Notes to its Consolidated Financial Statements.

● Investments. The Staff has requested fulsome analysis of the Company's accounting for various Simple Agreements on Future Equity ("SAFEs") and its investment in equity of certain investees. The Company has provided such analysis and has included impacts of any change in accounting for such investments in the restated financial results.

● Risk factors. The Staff has requested further disclosure on material risks due to regulations, ability to obtain financing, reputational harm, and depreciation of digital assets prices. The Company has considered such risks and has made the disclosures accordingly.

● Bitcoin as collateral. The Staff has raised several comments on the Company's accounting for bitcoin used as collateral within the Company's lending arrangements. The Company continues to respond to the Staff's comments based on its application of U.S. GAAP and has not changed its classification of such bitcoin used as collateral as Digital assets, restricted.

125.    The Restatement disclosed the following impacts of the accounting errors on Marathon's Revenue Recognition and Impairment of Digital Assets:

| (in thousands) | Three months ended (unaudited) | | | | Year ended |
|---|---|---|---|---|---|
| | March 31, 2022 (Restated) | June 30, 2022 (Restated) | September 30, 2022 (Restated) | December 31, 2022 | December 31, 2022 |
| Consolidated Statements of Comprehensive Income (Loss) Impact | | | | | |
| Total revenues | 5 | 1 | — | — | **6** |
| Cost of revenues - energy, hosting and other | (5) | (1) | — | — | **(6)** |
| **Net income (loss) impact** | — | — | — | — | — |

| (in thousands) | Three months ended (unaudited) | | | | Year ended |
|---|---|---|---|---|---|
| | March 31, 2021 (Restated) | June 30, 2021 (Restated) | September 30, 2021 (Restated) | December 31, 2021 (Restated) | December 31, 2021 (Restated) |
| Consolidated Statements of Comprehensive Income (Loss) Impact | | | | | |
| Total revenues | — | — | 624 | 8,075 | **8,699** |
| Cost of revenues - energy, hosting and other | — | — | (624) | (8,075) | **(8,699)** |
| **Net income (loss) impact** | — | — | — | — | — |

* * *

| (in thousands) | As of (unaudited) | | | |
|---|---|---|---|---|
| | March 31, 2022 (Restated) | June 30, 2022 (Restated) | September 30, 2022 (Restated) | December 31, 2022 |
| Consolidated Balance Sheets Impact | | | | |
| Digital assets | (6,204) | (9,344) | (5,433) | — |
| Digital assets, restricted - Current assets | — | (3,657) | — | — |
| Digital assets, restricted - Other assets | — | — | (3,039) | — |

| (in thousands) | Three months ended (unaudited) | | | | Year ended |
|---|---|---|---|---|---|
| | March 31, 2022 (Restated) | June 30, 2022 (Restated) | September 30, 2022 (Restated) | December 31, 2022 | December 31, 2022 |
| Consolidated Statements of Comprehensive Income (Loss) Impact | | | | | |
| Impairment of digital assets | (3,756) | (6,797) | 4,529 | — | **(6,024)** |
| **Net income (loss) impact** | (3,756) | (6,797) | 4,529 | — | **(6,024)** |

As of (unaudited)

| (in thousands) | March 31, 2021 (Restated) | June 30, 2021 (Restated) | September 30, 2021 (Restated) | December 31, 2021 (Restated) |
|---|---|---|---|---|
| **Consolidated Balance Sheets Impact** | | | | |
| Digital assets | (204) | (2,148) | (1,597) | (2,448) |

| | Three months ended (unaudited) | | | | Year ended |
|---|---|---|---|---|---|
| (in thousands) | March 31, 2021 (Restated) | June 30, 2021 (Restated) | September 30, 2021 (Restated) | December 31, 2021 (Restated) | December 31, 2021 (Restated) |
| **Consolidated Statements of Comprehensive Income (Loss) Impact** | | | | | |
| Impairment of digital assets | (204) | (1,944) | 551 | (851) | **(2,448)** |
| **Net income (loss) impact** | (204) | (1,944) | 551 | (851) | **(2,448)** |

126.    Between 2021 and 2022, additional line items were restated in the Restatement, including the Consolidated Balance Sheets and Comprehensive Income (Loss) of the Fund, Disposal of Assets, accruals for legal expenses, accumulated comprehensive income, prepaid expenses, income tax expenses, total assets, liabilities and stockholders' equity, and more.

127.    Moreover, the Restatement disclosed specific material weaknesses in Marathon's financial reporting, including the Company's application and interpretation of Generally Accepted Accounting Principles, stating:

management identified a weakness in internal control over financial reporting related to the application and interpretation of generally accepted accounting principles ("GAAP") primarily in the areas of consolidation, impairment of digital assets, disposal of property and equipment and principal versus agent considerations in revenue recognition. In addition, the Company has not designed or implemented user access controls to ensure appropriate segregation of duties, or program change management controls for certain financially relevant systems impacting the Company's processes around revenue recognition and digital assets to ensure that IT program and data changes affecting the Company's (i) financial IT applications, (ii) digital currency mining equipment, and (iii) underlying accounting records, are identified, tested, authorized and implemented appropriately to validate that data produced by its relevant IT system(s) were complete and accurate. Automated process-level controls and manual controls that are dependent upon the information derived from such financially relevant systems were also determined to be ineffective as a result of such deficiency. The Company has also not effectively designed a key manual control to detect material misstatements in revenue.

The material weakness related to the application and interpretation of GAAP, as described above, resulted in a material misstatement to the Company's previously issued

consolidated financial statements. The material weakness associated with the manual control over revenue recognition did not result in a material misstatement to the Company's previously issued consolidated financial statements, nor in the consolidated financial statements included in this Annual Report on Form 10-K.

## **DAMAGES TO MARATHON**

128.    As a direct and proximate result of the Individual Defendants' conduct, Marathon has been seriously harmed and will continue to be harmed. The Company will be subject to vast expenditures including, but not limited to:

- Legal fees incurred in connection with the Securities Class Action filed against the Company and three of the Individual Defendants;

- Costs incurred from the compensation and benefits paid to the Individual Defendants who have breached their fiduciary duties to Marathon;

- Costs incurred from complying with the SEC's investigation, the Restatement, and the Company's own internal investigation;

- Costs incurred from remedying the material weaknesses in the Company's financial reporting controls.

129.    Additionally, Marathon's business, goodwill, and reputation with its industry partners, regulators, and stockholders have been gravely tarnished. For the foreseeable future, the Company will suffer from a "liar's discount" from the Company's misrepresentations and the Individual Defendants' breaches of fiduciary duty.

## **DERIVATIVE ALLEGATIONS**

130.    Plaintiff brings this action derivatively and for the benefit of Marathon to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and officers of Marathon and violations of the Exchange Act. Marathon is named solely as a

nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

131.    Plaintiff has continuously been a stockholder of Marathon at all relevant times. Plaintiff will adequately and fairly represent the interests of Marathon in enforcing and prosecuting its rights.

## DEMAND IS EXCUSED AS FUTILE

132.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

133.    When this action was filed, Marathon's Board consisted of seven members: Defendants Thiel, Antoun, DeNuccio, James, Leupp, Ouissal, and Mellinger (the "Director-Defendants"). Plaintiff only needs to allege demand futility to four of the seven Directors who are on the Company's Board when this action was filed.

134.    Demand is excused as to all of the Director-Defendants because each of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to cause Marathon to make false and misleading statements and omissions of material facts, thus rendering them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

135.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly made and/or caused Marathon to make the materially false and misleading statements alleged herein. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

136.    Demand is excused as to the Director-Defendants because they breached their fiduciary duty to the Company—for which they face a substantial likelihood of liability—by causing the Company to pay Defendants Thiel, Antoun, DeNuccio, James, Leupp, Ouissal, and Mellinger their annual salary,

stock awards, option awards, non-equity incentive plan compensation, and/or all other compensation each year that they violated the Company's policies. Indeed, the misconduct described herein could not be the product of legitimate business judgment because it was based on bad faith and intentional, reckless, or disloyal misconduct.

137.    In addition, Defendants Thiel, Antoun, Leupp, and DeNuccio caused the 2021 Proxy Statement to call for a shareholder vote to approve an increase in the number of shares available in the Plan by 7,500,000, which provided for the grant of stock and cash-based performance awards for officers and directors, including each of the Director-Defendants. The misrepresentations and omissions set forth herein were material to shareholders in voting on the increase in the number of shares available in the Plan who would not have approved the increase of available shares in the Plan, had they been informed about the Individual Defendants' misconduct. As such, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

138.    The Director-Defendants received material benefits under the amendment to the Plan, making it unlikely they would consider a demand that threatens the benefits they receive with the requisite level of disinterestedness. Thus, for this reason too, any demand on the Director-Defendants would be futile and is excused.

139.    **Defendant Thiel -** Defendant Thiel has been Marathon's CEO and Chairman of the Board since April 26, 2021, and January 1, 2022, respectively. Therefore, as Marathon admits, Defendant Thiel is not an independent director. Marathon provides Defendant Thiel with his principal occupation, for which he receives significant compensation.

140.    As CEO, Defendant Thiel was responsible for all the false and misleading statements and omissions made during the Relevant Period, including the false and misleading statements that Defendant Thiel made in each of Marathon's SEC filings and press releases, cited above.

141.    Additionally, the 2021 and 2022 Proxy Statements were solicited on Defendant Thiel's behalf, both of which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting him to the Board and approving the availability of 7,500,000 more common shares in the Plan on false pretenses. As Marathon's top officer and trusted Chairman of the Board, Defendant Thiel conducted little, if any, oversight of the Individual Defendants' scheme to cause Marathon to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Thiel is one of the named defendants in the Securities Class Action. As a result, Defendant Thiel breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent nor disinterested. Therefore, demand upon Defendant Thiel is futile and excused.

142.    **Defendant Antoun** - Defendant Antoun has been a Company director since May 2021. As a board member he serves as the chair of the Compensation Committee, as a member of the Nominating and Corporate Governance Committee, and as a member of the Audit Committee. Defendant Antoun receives significant compensation from Marathon for his services on the Board.

143.    Additionally, the 2021 and 2022 Proxy Statements were solicited on Defendant Antoun's behalf, both of which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting him to the Board and approving the availability of 7,500,000 more common shares in the Plan on false pretenses. As a trusted director of Marathon, he conducted little, if any, oversight of Marathon's engagement in the scheme to cause Marathon to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. As a result, Defendant Antoun breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

144.    **Defendant DeNuccio** - Defendant DeNuccio has been a Marathon director since January 2021. Marathon provides Defendant DeNuccio with significant compensation for his services.

145.    Additionally, the 2021 and 2022 Proxy Statements were solicited on Defendant DeNuccio's behalf, both of which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting him to the Board and approving the availability of 7,500,000 more common shares in the Plan on false pretenses. As a trusted director of Marathon, Defendant DeNuccio conducted little, if any, oversight of the scheme to cause Marathon to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. As a result, Defendant DeNuccio breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and therefore demand upon him is futile and excused.

146.    **Defendant James** - Defendant James has been a director of Marathon since August 2021. As a board member, Defendant James serves as the chair of the Nominating and Corporate Governance Committee. The Company provides Defendant James with significant compensation for her services.

147.    Additionally, the 2022 Proxy Statement was solicited on Defendant James' behalf, which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting her to the Board. As a trusted Marathon director, Defendant James conducted little, if any, oversight of the scheme to cause Marathon to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant James breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and excused.

148.    **Defendant Leupp** - Defendant Leupp has been a director of Marathon since May 2021. As a board member, he serves as the chair of the Audit Committee, as a member of the Compensation

Committee and the Nominating and Corporate Governance Committee. Marathon provides Defendant Leupp with significant compensation for his services.

149.   Additionally, the 2021 and 2022 Proxy Statements were solicited on Defendant Leupp's behalf, both of which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting him to the Board and approving the availability of 7,500,000 more common shares in the Plan on false pretenses. As a trusted Company officer and director, he conducted little, if any, oversight of the Individual Defendants' scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Leupp breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

150.   **Defendant Ouissal** - Defendant Ouissal has been a director of Marathon since August 2021. As a board member, Defendant Ouissal serves as a member of the Nominating and Corporate Governance Committee, the Audit Committee, and the Compensation Committee. Marathon provides Defendant Ouissal with significant compensation for his services.

151.   Additionally, the 2022 Proxy Statement was solicited on Defendant Ouissal's behalf and contained false and misleading statements that contributed, *inter alia*, to shareholders reelecting Defendants Antoun and Leupp to the Board, among other things. As a trusted Marathon director, he conducted little, if any, oversight of the scheme to cause Marathon to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. As a result, Defendant Ouissal breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and therefore demand upon him is futile and excused.

152.    **Defendant Mellinger** - Defendant Mellinger has been a Company director since March 2022.

153.    Additionally, the 2022 Proxy Statement was solicited on Defendant Mellinger's behalf and contained false and misleading statements that contributed, *inter alia*, to shareholders reelecting Antoun and Leupp to the Board, among other things. As a trusted Marathon director, he conducted little, if any, oversight of the scheme to cause Marathon to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Mellinger breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

154.    Additional reasons that demand on the Board is futile follow.

155.    **Audit Committee -** Defendants Leupp, Ouissal, and Antoun (the "Audit Committee Defendants") served as members of Marathon's Audit Committee during the Relevant Period. As per Marathon's Audit Committee Charter, members of the Audit Committee are responsible for ensuring the effectiveness of Marathon's internal controls, the integrity of financial statements, and Marathon's compliance with laws and regulations. At all relevant times discussed herein, the Audit Committee Defendants failed to ensure the integrity of Marathon's controls and allowed the Company to disseminate materially misleading financial statements in its SEC filings and other disclosures.  As a result, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

156.    Marathon has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Marathon

any part of the damages Marathon suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

157.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

158.    The acts complained of herein constitute violations of fiduciary duties owed by Marathon's officers and directors, and these acts are incapable of ratification.

159.    If the Director Defendants caused the Company to purchase directors' and officers' liability insurance for the Individual Defendants' protection with corporate funds (i.e., monies belonging to the stockholders of Marathon), then the Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Marathon, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

160.     If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Marathon to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

161.     Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

### **Against Individual Defendants for Violations of**
### **Section 14(a) of the Exchange Act**

162.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

163.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

164.     Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

165.     Under the direction and watch of the Director-Defendants, the 2021 Proxy Statement and 2022 Proxy Statement (the "Proxy Statements") failed to disclose, *inter alia*, that: (i) Marathon materially

misstated its revenue, cost of revenue, and other financial information in its 2021 and 2022 SEC filings; (ii) Marathon continuously downplayed its serious problems with internal controls; and (iii) because of this, the SEC would scrutinize Marathon, Marathon would need to restate several financial statements, and Marathon was reasonably likely to suffer significant damage, including reputational harm. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

166.    Moreover, the Proxy Statements were false and misleading when both discussed the Company's adherence to specific governance policies and procedures, including the Code of Ethics, due to the Individual Defendants' failures to abide by them and their engagement in the scheme to issue false and misleading statements and omissions of material fact.

167.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statements, including but not limited to, election of directors, ratification of an independent auditor, and changes to the named executives' compensation plan.

168.    The false and misleading elements of the Proxy Statements led to the increase by 7,500,000 of shares available in the Company's Plan, the increase of authorized shares of Company common stock from 200 to 300 million, and to the re-election of Defendants Thiel, DeNuccio, Ouissal, James, Antoun, and Leupp to the Board, which allowed them to continue breaching their fiduciary duties to Marathon.

169.    The Company was damaged because of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements.

170.    Plaintiff on behalf of Marathon has no adequate remedy at law.

## SECOND CLAIM

**Against the Individual Defendants for Breach of Fiduciary Duties**

171.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

172.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Marathon's business and affairs.

173.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

174.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Marathon.

175.    In breach of their fiduciary duties owed to Marathon, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (i) Marathon materially misstated its revenue, cost of revenue, and other financial information in its 2021 and 2022 SEC filings; (ii) Marathon continuously downplayed its serious problems with internal controls; and (iii) because of this, the SEC would scrutinize Marathon, Marathon would need to restate several financial statements, and Marathon was reasonably likely to suffer significant damage, including reputational harm. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

176.    The Individual Defendants also failed to correct and/or caused the Company to fail to correct the false and misleading statements and/or omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

177.    In breach of their fiduciary duties, at least one of the Individual Defendants engaged in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein.

178.    Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain effective disclosure controls and procedures and internal controls.

179.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Marathon's securities and disguising insider sales.

180.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Marathon's securities and disguising insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

181.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

Verified Shareholder Derivative Complaint

182.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Marathon has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

183.     Plaintiff on behalf of Marathon has no adequate remedy at law.

### PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Marathon, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Marathon;

(c)     Determining and awarding to Marathon the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Marathon and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Marathon and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Marathon to nominate at least four

candidates for election to the Board;

        3.  a provision to eliminate the staggered, class-based director election and director term-length system; and

        4. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

    (e)     Awarding Marathon restitution from Individual Defendants, and each of them;

    (f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

    (g)     Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

    Plaintiff hereby demands a trial by jury.

Dated: July 12, 2023

Respectfully submitted,

*s/*

Patrick R. Leverty

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com

**LEVERTY & ASSOCIATES LAW CHTD.**
Reno Gould House
832 Willow Street
Reno, NV 89502
Telephone: (775) 322-6636
Facsimile: (775) 322-3953
Email: pat@levertylaw.com

*Counsel for Plaintiff*

Verified Shareholder Derivative Complaint

## <u>VERIFICATION</u>

I, Gary Konigsberg, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this __ day of 7/5/2023 , 2023.

DocuSigned by:

GARY KONIGSBERG

1FDB04BE41D14FC...